desertion filed by this defendant husband, I should have granted him a decree on a counter-claim. However, no such counter-claim was filed. The petitioner is not entitled to the relief sought, and the petition will be dismissed."

*Mr. Raymond H. Berry,* for the appellant.

*Mr. Paula Laddey,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons expressed in the opinion filed by Advisory Master Child.

*For affirmance*—THE CHANCELLOR, TRENCHARD, PARKER, LLOYD, CASE, BODINE, DONGES, BROGAN, VAN BUSKIRK, KAYS, DEAR, WELLS, KERNEY, JJ.  13.

*For reversal*—None.

EDWARD E. DAMMERS, for whom has been substituted J. CHESTER MONCRIEFF, administrator, complainant-respondent,

v.

JOHN W. CROFT, JR., et al., defendants-appellants.

[Submitted May 27th, 1932.  Decided October 17th, 1932.]

On appeal form a decree of the court of chancery advised by Vice-Chancellor Leaming, who filed the following opinion:

"Complainant is a judgment creditor of John W. Croft, Jr., and seeks to set aside a conveyance made by the latter to his wife, Pearl L. Croft. The conveyance from Croft, Jr., to his wife was without consideration—admittedly a deed of gift. The primary inquiry is whether at the time of the conveyance the donor was insolvent or thereby rendered insolvent, within the purview of our Fraudulent Conveyance act. *P. L. 1919 p. 500; 1 Cum. Supp. Comp. Stat. (1924) p. 647.*

"The indebtedness of Croft, Jr., to complainant originated in April, 1925. The conveyance of Croft, Jr., to his wife was made July 25th, 1926. Complainant's judgment was entered July 16th, 1928. The bill was filed July 16th, 1929.

"On January 17th, 1928, Pearl L. Croft, and her husband, executed a mortgage on the same premises to John W. Croft, Sr., father of Croft, Jr. The bill also seeks to set aside that mortgage.

"By reason of the death before final hearing of both complainant and defendant, Croft, Sr., the court has been denied the benefit of their testimony.

"Two distinct issues are thus involved. 1. Whether the deed of gift to the wife of the donor is void as to complainant. If not, no further inquiry is necessary. 2. If found to be void, then the inquiry arises whether the mortgage to Croft, Sr., which is claimed to secure an existing indebtedness of Croft, Jr., to Croft, Sr., is void as to complainant.

"By the provisions of the fourth section of the act, this deed of gift to the wife must be deemed fraudulent as to complainant, without regard to the actual intent of the donor, if the donor was, or was thereby rendered, insolvent. The insolvency there referred to is defined by section 2 (1) of the act, as follows: 'A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.' In the absence of evidence of actual intent to defraud, these provisions must control the validity of the gift, as against complainant.

"I am not inclined to believe that this deed of gift was made by the debtor to his wife in the belief that his remaining assets were inadequate in value at that time to meet his obligations; but I am unable to discern how any comprehensive view of the evidence can escape the conviction that no such values then existed. We are largely dependent on the testimony of the debtor touching the amount of his obligations at that time. The debtor and his brother-in-law had been engaged in actively speculating in Florida real estate in what they style a joint enterprise. The bulk of the debts were their joint notes accompanying mortgages on Florida land; lands purchased by them to sell at a profit. The Florida obligations totaled, at the time the deed of gift was executed, about $275,000 or $300,000, according to the testimony of the judgment debtor. In addition the debtor owed at that time to banks in Camden, New Jersey, about $170,000. The aggregate would thus be about $445,000 or $470,000. As respectively summarized by the debtor, he at that time owed 'between four hundred and fifty and four hundred and seventy-five thousand dollars of notes outstanding.' This was exclusive of $170,000 which he at that time owed his father, should that be treated as a debt. He says, however, that at that time he considered himself worth some $600,000 above his debts; but any contemplation of that nature was obviously based upon his sanguine expectation that the real estate market in Florida would eventually return to its former condition. At that time the real estate 'boom' in Florida had

broken. The market had practically gone; and no sales could be made except at what was deemed ruinous prices by those who held on in the hope of the return of the 'boom.' Real estate speculators had closed up and gone home; according to the testimony 'the Jews had been driven out.' All that appears to have remained in the nature of values was the hope, indulged by those left with real estate on their hands, that in the following fall the market would return. It did not return. In these Florida holdings the debtor and his brother-in-law were jointly interested; their Florida obligations were also joint, and the debtor's liability necessarily included the entire amount in case of default by his joint debtor. Solicitor of defendants has, in his brief, calculated the values of the Florida holdings at the prices per lot at which the associate of the judgment debtor says they could have been sold and has thus ascertained an aggregate value in excess of the joint debts. But any such estimate of 'present fair salable value' presents an inadequate view of the situation and also wholly ignores the testimony of Mr. Davis to the effect that no sales could then be made. The obvious truth is that the judgment debtor and his associate had their capital practically tied up in encumbered, unproductive and unsalable Florida real estate and were carrying on with their tremendous debts as best they could in the hope of better times to come. They were meeting their obligations as best they could in a hope which the members of that community interested in real estate seem to have been abandoned. The first note held by complainant for $5,000 had matured April 30th, 1926, and half of it was at that time paid and an extension of time procured for the balance. On the note of $10,000, held by witness, Davis, interest due in October, 1925, and April, 1926, was not met, and nothing paid towards its reduction. It is impossible to escape the conclusion that at the time this deed of gift was executed these two men were undergoing a struggle to keep their heads above water in the single hope that their capital, then tied up in unsalable real estate, might be made available by the return of a market; a hope which had at that time been practically abandoned by the

general public. For a debtor in that condition to turn over to his wife as a gift a valuable property in New Jersey appears to me to be clearly violative of the provisions of our statute, already referred to, as well as the following section (section 5) which avoids a gift, without regards to its actual intent, by one in business, when his remaining property, after the conveyance, is an unreasonably small capital. It is true that at the time this gift was made these men were not as active in their business as theretofore; they could not be since their capital was practically all tied up in the Florida real estate which they had already acquired subject to the obligations referred to. But their business, with their capital in frozen and unavailable assets, continued, and that capital was too small to even enable them to carry on for the purpose of speculation on the hope of a better market to come. I have herein avoided giving consideration to the shrinkage of real estate values in Florida following the execution of the deed of gift and the demonstrated inability of these men to carry on. These are not to be considered. The conditions existing at the date of the questioned transaction control. Clearly those conditions did not permit the judgment debtor to transfer this valuable New Jersey real estate to his wife as against the rights of complainant as an existing creditor. Nor have I overlooked the circumstances that at this time the old doctrine of irrebuttable presumption of fraud as to existing creditors no longer obtains.

It is, I think, also clear that the mortgage subsequently executed to defendant Croft, Sr., by the judgment debtor and his wife, on the land here in controversy, cannot stand. In referring to the debts of the son I have not included the amount of $170,000, which it is claimed the judgment debtor at that time owed his father, because it seems clear that that was not a debt. That money, together with subsequent advances made by the father to pay the Camden banks, for both of which the mortgage was given to the father, were clearly advances to the son on account of his inheritance in his father's estate at his father's death, and in no sense a debt from the son to his father. Advances of that nature by a

father to a son appear to be uniformly regarded as pure and irrevocable gifts. 'An advancement created no debt to the person making it and in all its feature and in its very nature is distinguishable from a debt or indebtedness.' *Dawson* v. *Macknet, 42 N. J. Eq. 633, 635.* 'If a transaction between father and son amounts to an advancement at the time it takes place, it cannot afterwards be converted into a debt without the intervention of some new consideration.' *Higham* v. *Vanosdal, 125 Ind. 60; 25 N. E. Rep. 140, 141.* This seems to be necessarily true, since an advancement appears to be uniformly regarded as a consummated gift. The mortgage must be declared void as against complainant."

*Mr. Louis B. LeDuc,* for the appellants.

*Messrs. Bleakly, Stockwell & Burling,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons expressed in the opinion filed by Vice-Chancellor Leaming.

*For affirmance*—THE CHANCELLOR, TRENCHARD, PARKER, LLOYD, CASE, BODINE, BROGAN, VAN BUSKIRK, KAYS, DEAR, WELLS, KERNEY, JJ. 12.

*For reversal*—None.